CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

02/16/2018

JULIA C. DUDLEY, CLERK
BY: /s/ H. Wheeler
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

TONIA WOODSON NEWTON, *ET AL.*,

    *Plaintiffs,*

v.

BENEFICIAL FINANCIAL I, INC., *ET AL.*,

    *Defendants.*

CASE NO. 3:16-CV-00058

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

  This case is before the Court on motions for summary judgment, to compel discovery, and to amend the complaint.[1] It concerns the status of a mortgage and a home equity loan made to the Judith Woodson. Woodson purchased a home in Gordonsville, Virginia. She financed that purchase with a mortgage issued by a predecessor of Beneficial Financial I, Inc. ("Beneficial"). Roughly a year later, she received another loan from Beneficial based on her equity in that home. Beneficial sold that second loan to Ditech Financial, LLC ("Ditech"). However, Woodson eventually fell behind in making payments on these loans. Woodson passed away in 2015, and the three plaintiffs in this suit ("the heirs") inherited the home. Because of delinquencies on the loans, Beneficial moved to foreclose. The heirs filed this suit to stop the foreclosure proceedings. During the pendency of the suit, Carrington Mortgages Services, LLC ("Carrington"), who is not a party to this suit, purchased the first mortgage from Beneficial.

  The heirs, in an action for quiet title, asked the Court to determine whether Beneficial discharged the home equity loan (Count One). Because they alleged that this loan had been discharged, the heirs also argued Beneficial and Ditech wrongly refused to remove a related lien on the property (Counts Two and Three). This failure to remove the lien allegedly prevented the

---

[1]  The case was originally filed in the Louisa County Circuit Court. (Dkt. 1). The defendants removed the case based on diversity jurisdiction to federal court, before Judge Conrad. The case was transferred to me on December 15, 2017. (Dkt. 87).

heirs from selling the property and discharging the first loan, the mortgage. And so the heirs asked for a declaratory judgment preventing foreclosure and the imposition of related costs (Counts Four and Five). The heirs finally asked the Court for a declaratory judgment about the outstanding balance on the first loan (Count Six).

Beneficial and Ditech moved for summary judgment on these claims. I grant summary judgment on the claims relating to the home equity loan because no reasonable jury could find that Beneficial or Ditech ever cancelled that loan. I dismiss the claims relating to the mortgage without prejudice because Beneficial has sold the mortgage, and so the requests for declaratory judgments against it are moot. Finally, I deny the motion to compel because the heirs did not conform with Judge Conrad's scheduling orders. I deny the motion to amend because amendment at this stage would prejudice these defendants.

### I. MOTION TO COMPEL DISCOVERY

The heirs' motion to compel, (dkt. 59), was automatically denied by operation of Judge Conrad's scheduling order. The motion, filed on September 20, 2017, claimed that Beneficial did not sufficiently respond to the heirs' requests for Beneficial's files on the two loans. (*Id.* at ECF 2-5). According to Judge Conrad's scheduling orders, the heirs were required to schedule a hearing or advise the Court that the motion was ripe for decision within 45 days of filing that motion. (Dkt. 52 at ECF 3; *see also* dkt. 62 at ECF 3). The parties continued with discovery, with the heirs' taking the defendants' depositions and the defendants turning over more documents. (Dkts. 60, 61, 90). Discovery concluded on October 18, 2017, (dkt. 62 at ECF 1), and the Court did not hear any more about this dispute until the heirs' opposition to summary judgment, (dkt. 77 at ECF 3). The heirs never scheduled a hearing or advised the Court that the motion was ripe for decision. Per the language of Judge Conrad's scheduling orders, this motion

was automatically denied by virtue of the passing of time. *See* dkt. 62 at ECF 3 ("[T]he motion will be deemed denied without further notice or order of this court . . . ."); *see also* Local Rule 11(b) ("Unless otherwise ordered, a motion is deemed withdrawn if the movant does not set it for hearing (or arrange to submit it without a hearing) within 60 days after the date on which the motion is filed."). Holding otherwise would prejudice the defendants, who briefed summary judgment on the belief that the dispute was resolved, (dkt. 90), and would potentially delay the resolution of this case by requiring the reopening of discovery. Whether all of the appropriate documents were produced was a matter that the heirs needed to bring up within the deadlines set by Judge Conrad. The Court will not reopen discovery now; the motion is denied.[2]

## II. SUMMARY JUDGMENT

### A. Standard of Review

I now move on to the defendants' motions for summary judgment. Federal Rule of Civil Procedure 56(a) provides that a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact." "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to preclude summary judgment, the dispute about a material fact must be "genuine." *Id.* A

---

[2] While the motion to compel is denied for the above reasons, I further note that Beneficial appears to have largely complied with the heirs' discovery requests. The heirs' motion to compel reiterated requests for "any computer or email records relating to any communications that referenced [the heirs] or their mother by name," "[t]he entire file of each defendant, omitting nothing, on the loans that are the subject of this case," and "[t]he entire file of each defendant, omitting nothing, on the residence that is the subject of [this litigation]." (Dkt. 59 at ECF 1; dkt. 59-1 at ECF 10). While all of the documents produced by Beneficial are not before the Court, it is at least clear that Beneficial produced loan histories and monthly statements for both loans. (*See* dkt. 84 at ECF 2; dkt. 84-1 at ECF 1-576). When this case was transferred to me, Beneficial submitted a letter maintaining that it had "produced all documents related to both loans . . . ." (Dkt. 90). The heirs never responded.

3

dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* But "[t]he responsibility to comb through the record in search of facts relevant to summary judgment falls on the parties—not the court." *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017). I must view the cited materials as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).

**B. Undisputed facts**

Judith Woodson purchased a home in Gordonsville, Virginia in January 2005. To finance the purchase, she received a mortgage for $117,304.54 from Beneficial Mortgage Company. (Dkt. 69-1 at ECF 4; dkt. 69-2 at ECF 2; dkt. 69-3 at ECF 2). This loan was secured by the property. (Dkt. 69-3 at ECF 2). As part of the mortgage, Woodson promised to make monthly repayments on the loan. (Dkt. 69-2 at ECF 3). A little over a year later, in March 2006, Woodson received a second loan from Beneficial for $31,200.00. (Dkt. 69-4; dkt. 69-5 at ECF 2). This loan was also secured by Woodson's property, and Woodson again promised to make repayments. (Dkt. 69-4; dkt. 69-5 at ECF 2).

The loan payment histories and statements demonstrate Woodson was frequently behind on both loans. (Dkt. 69-10 at ECF 5; dkt. 84-1 at ECF 2-26 (demonstrating irregular payments and late charges throughout the lives of the loans)). Beneficial's statement to Woodson indicated that the mortgage had an amount past due of $3,578.30 at the end of 2011. (Dkt. 84-1 at ECF 284). The home equity loan was also behind at that time. (*Id.* at ECF 474). Internally, Beneficial marked the home equity loan as "charged off." This designation meant that Beneficial felt repayment was unlikely, although Beneficial did not indicate that Woodson had

4

repaid the loan or that Beneficial would stop trying to recover the remaining balance. (Dkt. 69-6 at ECF 4).

Beneficial sent a Form 1099-C to Woodson concerning fiscal year 2012. (Dkt. 69-6 at ECF 3; dkt. 69-7; dkt. 69-8 at ECF 3). A Form 1099-C is an IRS form that creditors must file with debtors when they discharge indebtedness. 26 C.F.R. § 1.6050P–1(a). This form indicated that $30,749.87 of Woodson's mortgage debt had been discharged. (Dkt. 69-7). However, Beneficial believed that it had sent this form in mistake, and so it issued a corrected Form 1099-C that indicated that no mortgage debt had been discharged. (Dkt. 69-9; dkt. 69-6 at ECF 3).

In 2013, the parties talked about settling the outstanding second loan. Beneficial sent settlement offers to Woodson regarding this loan after it had been charged off. (Dkt. 69-6 at ECF 5). Woodson agreed to a settlement plan and made some payments on it. (*Id.*). In April 2013, Woodson advised Beneficial that she would not be able to make the final payments on the settlement plan because she had lost her job. (Dkt. 84-1 at ECF 614; dkt. 69-6 at ECF 5). Woodson's daughter stated that she had a separate call with Beneficial during April 2013 and that a Beneficial representative told her that "no payments needed to be made" on the second loan. (Dkt. 77-2 at ECF 6-7). Woodson's daughter also stated that she overheard a similar conversation when her mother was on a phone call with Beneficial in February 2014. (Dkt. 77-3 at ECF 1-2). The settlement plan was never completed. Approximately a year later, in May 2014, Beneficial sold the home equity loan to Ditech's predecessor. (Dkt. 84-1 at ECF 613; dkt. 69-8 at ECF 4; dkt. 69-12; dkt. 71-1 at ECF 2).

In March 2014, Beneficial and Woodson did negotiate an adjustment to the underlying mortgage, the first loan. (Dkt. 77-3 at ECF 2-3, 7-13). This agreement reduced the principal of that loan. (*Id.* at ECF 16). But even with this adjustment, Woodson fell behind again and asked

5

Beneficial to engage in a short sale. (*Id*. at ECF 50; dkt. 84-1 at ECF 6). Beneficial declined to engage in a short sale because it believed there was still equity in the home. (Dkt. 77-2 at ECF 8).

Woodson died intestate in March 2015. (Dkt. 69-10 at ECF 4). After Woodson's death, the plaintiffs inherited the property. (Dkt. 69-10 at ECF 5). Woodson's heirs sought to have the liens on the property released by Beneficial and were referred to the lien release department. (Dkt. 77-3 at ECF 3). Beneficial moved to foreclose on the property in August 2016, but was enjoined by the Louisa County Circuit Court. (Dkt. 7 at ECF 157). The case was then removed to this Court. (Dkt. 1). In September 2017, while this case was pending, Beneficial sold the first loan to Carrington Mortgage Services, LLC. (Dkt. 71-1 at ECF 4).

**C. Discussion**

The heirs have two categories of claims: those seeking relief related to the home equity loan and those seeking relief related to the first mortgage. The claims related to the home equity loan fail because no reasonable jury could find that Beneficial discharged that loan. The claims seeking relief related to the first mortgage fail because they became moot when Beneficial sold the loan to Carrington. Because Beneficial no longer owns the mortgage, the heirs cannot get the relief they seek from Beneficial. Accordingly, I will grant the defendants' motions for summary judgment on all counts.[3]

---

[3] The heirs' opposition to the motions for summary judgment does not address many of the facts established by the defendants and does not provide its own citations for many of the facts that it does dispute. It contains two pages of response to the defendants' arguments in favor of summary judgment. (Dkt. 77 at ECF 7-9). "The responsibility to comb through the record in search of facts relevant to summary judgment falls on the parties—not the court." *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017).

**1. The claims related to the home equity loan fail because no reasonable jury could find that Beneficial discharged that loan.**

The first, and most central, of the heirs' claims related to the home equity loan is an action to quiet title. "'[A]n action to quiet title is based on the premise that a person with good title to certain real or personal property should not be subjected to various future claims against that title.'" *Horvath v. Bank of New York, N.A.*, 641 F.3d 617, 622 (4th Cir. 2011) (quoting *Maine v. Adams*, 277 Va. 230, 238 (2009)). "[I]n a quiet title action, a plaintiff asks the court to declare that he has good title to the property in question and compels any adverse claimant to prove a competing ownership claim or forever be barred from asserting it." *Adams*, 277 Va. at 238; *see also McFadden v. Fed. Nat. Mortg. Ass'n*, 525 F. App'x 223, 228 (4th Cir. 2013) (quoting *Adams*). A plaintiff asserting a claim for quiet title must demonstrate that "he has satisfied his legal obligations to the party in interest and, thus, maintains a superior interest in the property." *Jones v. Fulton Bank, N.A.*, 565 F. App'x 251, 253 (4th Cir. 2014).

Woodson received her the home equity loan from Beneficial in March 2006. (Dkt. 69-4; dkt. 69-5 at ECF 2). The deed of trust, which was executed contemporaneously with this loan, demonstrates that the loan was secured by Woodson's property. (Dkt. 69-5 at ECF 2). Woodson covenanted to make prompt payments on this loan. (*Id.* at ECF 3). Woodson also "promise[d] to pay" Beneficial the "amounts borrowed under this Agreement" and related charges. (Dkt. 69-4 at ECF 3). In the event of her default, Woodson was required to repay any outstanding balance on the loan, with interest. (*Id.* at ECF 5). The agreement stated that "[i]n order for any amendment to [the loan agreement] to be valid, it must be in writing." (*Id.*). There is no evidence that the defendants returned the deed of trust or marked the note paid. The heirs do not contend that they or Woodson ever repaid the home equity loan; instead, they rely entirely on Beneficial's alleged cancellation of this loan.

The parties agree that Ditech purchased any interest that Beneficial had in the home equity loan. The question then is whether Beneficial had discharged Woodson's indebtedness before Ditech purported to purchase the loan from Beneficial. While the heirs have produced evidence that demonstrates that Beneficial provided erroneous communications to Woodson about the loan, there is no evidence that the loan itself was discharged by Beneficial. Accordingly, I agree with Ditech that no reasonable jury could find that the loan it purchased had previously been discharged by Beneficial, and so I grant the defendants summary judgment on Count One.

I now discuss the heirs' evidence.

*a. Phone calls with Beneficial representatives about the status of the loan*

In 2012 and 2013, Beneficial worked with Woodson in an attempt to settle the outstanding balance of her home equity loan. However, this settlement agreement fell apart in April 2013 because Woodson could not make the final payments required by the plan. In a phone call with a Beneficial representative, Woodson told Beneficial that this was because she had lost her job. (Dkt. 69-6 at ECF 5; dkt. 84-1 at ECF 614). Woodson's daughter stated that she had a separate call with Beneficial during April 2013 and that a Beneficial representative told her that "no payments needed to be made" on the second loan. (Dkt. 77-2 at ECF 6-7). This daughter also stated that she overheard a similar conversation when her mother was on a phone call with Beneficial in February 2014. (Dkt. 77-3 at ECF 1-2). Beneficial maintains that payment was still due on these loans, and that any statement made by a representative to the contrary would have been in error. (Dkt. 69-6 at ECF 4). For purposes of summary judgment, I must take Newton's characterization of these phone calls as true.

8

Even doing so, there is no material dispute about whether the loan was actually discharged. This is because the home equity loan agreement clearly stated that "[i]n order for any amendment to [the loan agreement] to be valid, it must be in writing." (Dkt. 69-4 at ECF 5). And Newton admits that there never was a written amendment to the loan agreement. (Dkt. 77-1 at ECF 60 ("I didn't receive anything in writing specifically saying that she did not have to make payments on the line of credit.")). Under Virginia law, it is true "that in certain circumstances written contracts, even those that contain prohibitions against unwritten modifications, may be modified by parol agreement." *Lindsay v. McEnearney Assocs., Inc.*, 260 Va. 48, 53 (2000). "This principle, however, does not apply to an agreement which must be in writing to satisfy [Virginia's statute of frauds]." *Id.* And under Virginia's statute of frauds, "[a]ny modification of a mortgage agreement must [] be in writing to be enforceable." *Baird v. Fed. Home Loan Mortg. Corp.*, No. 3:15-CV-00041, 2016 WL 6583732, at *3 (W.D. Va. Nov. 4, 2016), *aff'd*, 706 F. App'x 123 (4th Cir. 2017).

Courts have applied this requirement to home equity loans, which are a type of mortgage. *See Willner v. Dimon*, No. 1:14-CV-1708, 2015 WL 12766135, at *3 (E.D. Va. May 11, 2015) ("This claim fails to state a claim as a matter of law since an agreement to modify a mortgage is not enforceable unless in writing, [citing Virginia's statute of frauds]; and the facts alleged do not plausibly allege that Chase made any legally sufficient written offer to modify Plaintiffs' mortgage agreement." (discussing a home equity loan)), *aff'd*, 849 F.3d 93 (4th Cir. 2017). These verbal exchanges were insufficient to release Woodson's obligation to continue paying the home equity loan's outstanding balance and do not provide a basis for a reasonable jury to find that the loan was actually discharged.

### b. The corrected Form 1099-C

Perhaps realizing that the cancellation of the home equity loan would need to be reflected in writing, the heirs next focus on the Form 1099-C issued by Beneficial. A Form 1099-C is "a reporting mechanism to the IRS" that entities are required to file when they discharge debt. *F.D.I.C. v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013). It is not itself a discharge of debt. *Id.* Beneficial issued a Form 1099-C for fiscal year 2012 that indicated it had discharged around $30,000 of debt. (Dkt. 69-7). However, it is undisputed that Beneficial later issued a corrected Form 1099-C that indicated that no debt had been discharged. (Dkt. 69-9).

In *Cashion*, the Fourth Circuit concluded that "the mere fact that a Form 1099-C is filed does not constitute sufficient evidence, standing alone, that a debt has been cancelled." 720 F.3d at 180. In Judge Conrad's motion to dismiss opinion in this case, (dkt. 45), he discussed *Cashion* and held that, in light of the original Form 1099-C and the other allegations present in this case, there was a "plausible inference that the Line of Credit debt was cancelled by Beneficial." (*Id.* at 7). He was not aware of the corrected Form 1099-C. While this inference was plausible based on the allegations, it is no longer reasonable based on the evidence now before the Court.

Most notably, it is now undisputed that Beneficial realized that the original Form 1099-C had been produced in error, and it then issued the corrected Form 1099-C that demonstrated no debt had been discharged in 2012. (Dkt. 69-6 at ECF 3; dkt. 69-7; dkt. 69-8 at ECF 3; dkt. 69-9). The heirs cite to no evidence that disputes Beneficial's correction of the form. Newton, one of the heirs, did state that this corrected Form 1099-C was never sent to Woodson's home. (Dkt. 77-3 at ECF 2). But any dispute about whether Woodson received the corrected Form 1099-C is not material. Woodson's subjective belief about whether the debt had been discharged is not relevant; the focus must be on whether the loan actually was discharged. Here there is

undisputed evidence that the first form was filed by mistake, and so the first form does not provide evidence that the home equity loan was actually cancelled. *See Cashion,* 720 F.3d at 180 (noting that a Form 1099-C is insufficient evidence to support a jury's verdict because "it may [] have simply been filed by mistake.").

Additionally, the parties' behavior leaves no doubt that the original form did not reflect a discharge of debt. Both the original and the corrected Form 1099-C's indicated the "date of identifiable event" as May 30, 2012. (Dkt. 69-7; dkt. 69-9). Under Woodson's theory, this would have been the date that any debt was actually discharged. *See* 26 C.F.R. § 1.6050P–1(b)(2)(B) (defining identifiable event). But Beneficial and Woodson worked together in an attempt to settle this loan in 2013, after that date. (Dkt. 69-6 at ECF 5; dkt. 84-1 at ECF 614). These ongoing negotiations demonstrate the contemporaneous understanding of both parties that the loan remained binding and that no discharge of the loan occurred on May 30, 2012.

In response, the heirs rely on *Cashion*'s characterization of the "narrowness" of its holding. 720 F.3d at 181. In that case, the Form 1099-C was the only evidence put forward by the plaintiff. The court commented that, "[i]n another case, where a properly authenticated Form 1099–C is introduced into evidence along with other circumstantial evidence of cancellation of the debt, the Form 1099–C could be properly considered by the trier of fact under the totality of the circumstances on the ultimate issue of whether the debt in question was, in fact, cancelled." *Id.* Because, the heirs here do point to other evidence, they argue that they are entitled to survive summary judgment.

I disagree. *Cashion*'s language assumes that the "other competent evidence regarding the circumstances surrounding [the Form 1099-C's] filing" would make a finding that the debt was actually cancelled *more* likely. Here, alternatively, the discovery of the corrected form and the

11

ongoing negotiations of the parties all make the actual cancellation of the loan *less* likely. Any inference of cancellation that might have arisen from the issuance of a "properly authenticated Form 1099-C" dissipates when it is undisputed that the form was issued erroneously. And the corrected form not only weakens that inference, it is actually a clear statement of the opposite position: Beneficial believed the home equity loan was never discharged. The parties' continuing negotiations to settle the outstanding debt likewise demonstrates that Woodson did not believe the loan was discharged at this time. This evidence undermines any support the heirs seek from the Form 1099-C. Considering this undisputed evidence, a reasonable jury could not find in the heirs' favor.

       *c. The heirs' other arguments*

The heirs' two other arguments would require a jury to make unwarranted inferences. *See Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) ("[T]he nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."). Counsel for the heirs called Beneficial in an attempt to get Beneficial to "cancel the lien of the second mortgage loan in the public land records." (Dkt. 77-3 at ECF 5). This call was forward to the "lien release department." (*Id.*). The heirs argue that Beneficial's decision to refer this call to the "lien release department" is evidence that the loan had actually been released. (Dkt. 77 at ECF 8). But the heirs' desired inference is not "reasonable." As Beneficial's representative explained, all calls asking to Beneficial to cancel a lien were forwarded to the "lien release department." (Dkt. 77-2 at ECF 21). The mere forwarding of this call is not evidence that the loan was actually cancelled.

Likewise, Beneficial turned down a short sale application from the heirs because "there [was] sufficient equity in the property to pay the loan off in full." (Dkt. 77-3 at ECF 50). The heirs hypothesize that there would only have been equity in the home if the second loan had been released. (Dkt. 77 at ECF 8). But this is entirely speculative. Beneficial had already agreed to modify their mother's loan, subtracting some $30,000 off of the principal. (Dkt. 77-3 at ECF 16). There is no evidence that the combination of the remaining balance of the first mortgage and the home equity loan was less than Beneficial's valuation of the property. "The nonmoving party cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (internal citations and quotation marks omitted). These arguments fail to create a genuine dispute of material fact.

### d. Conclusion

I am left then with the corrected Form 1099-C and the statements of anonymous Beneficial representatives that no more payments were needed. These were errors made by Beneficial. But these errors, and the reasonable inferences that arise from them, would not allow a jury to find that the home equity loan had actually been discharged. Beneficial retained the note. Under Virginia law, this establishes a presumption that the loan agreement remains valid and unpaid. *See Schmitt v. Redd*, 151 Va. 333, 339 (1928); *see also Dashtara v. Wachovia Bank, N.A.*, No. 1:08-CV-1060, 2009 WL 2578956, at *2 (E.D. Va. Aug. 17, 2009) (citing *Schmitt* for the proposition that "[u]nder Virginia law, a presumption of nonpayment arises in favor of the plaintiff where the plaintiff retains possession of the note sued upon."). Beneficial continued trying to negotiate a settlement with Woodson after she fell behind. After that attempt failed, because Woodson stopped making payments after losing her job, Beneficial sold its interest in

the loan to Ditech. Ditech bought the loan for value. Discharging this loan would grant the heirs an unearned windfall. Accordingly, the defendants' motions for summary judgment on the heirs' action to quiet title (Count One) must be granted.

Counts Two through Four fall for much the same reason. Count Two asks the Court to remove the lien related to the second loan pursuant to Va. Code Ann. § 55-66.5. (Dkt. 35 at ECF 8). As relevant here, this statute allows a court to remove a lien "upon proof that the encumbrance has been paid or discharged." Va. Code Ann. § 55-66.5(A); *see, e.g., Sovereign Title Co. v. First Union Nat. Bank*, 51 Va. Cir. 495 at *11 (2000) (ordering removal of a lien pursuant to this statute). Because, as explained above, the heirs have not introduced evidence that would allow a reasonable jury to find that "the encumbrance has been paid or discharged," the defendants are entitled to summary judgment on this claim.

Likewise, Count Three asks for compensatory damages based on Beneficial's refusal to remove the lien associated with the second loan. (Dkt. 35 at ECF 9). But as discussed above, a reasonable jury could not find that the second loan was discharged, and so the defendants are entitled to summary judgment on this count as well.

Count Four asks for a declaratory judgment that the defendants are not entitled to foreclose on the home or add any foreclosure-related costs to the lien on the property. (Dkt. 35 at ECF 10-12). The theory underlying these requests again is that the attempted foreclosure was illegal because Beneficial had cancelled the second loan, but never removed the related lien that was on the property. (*Id.*). But once more, because no reasonable jury could find that the second loan was cancelled, the defendants are entitled to summary judgment on this claim.

Accordingly, the defendants are entitled to summary judgment on all counts related to the home equity loan (Counts One through Four).

**2. The remaining claims for declaratory judgments against Beneficial are moot.**

Beneficial sold the mortgage on the property to Carrington in August 2017, during the pendency of this litigation. Two of the claims, Counts Five and Six, related exclusively to this mortgage. Count Five seeks a declaratory judgment that Beneficial may not foreclose on the home or add costs to the lien until it complies with a Virginia disclosure law, Va. Code. Ann. § 55–59.1. (Dkt. 35 at ECF 13). Count Six asks for a declaratory judgment about the status of the mortgage loan and related lien. (Dkt. 35 at ECF 14). The sale made these claims moot, and so they will be dismissed without prejudice.

"To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (internal quotation marks omitted). A case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (some internal quotation marks omitted). Questions about mootness can become more difficult when interacting with declaratory judgments, but the Supreme Court has maintained that "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 138 (2007) (citing *Md. Cas. Co.*).

Here, the heirs may still dispute whether the property may be foreclosed on and what the balance of the outstanding mortgage is, but the problem is that these disputes are no longer with Beneficial. Carrington, not Beneficial, will be the instigator of any future foreclosure

proceedings. *See* Va. Code. Ann. § 55–59(7); *Horvath v. Bank of New York, N.A.*, 641 F.3d 617, 622 n.3 (4th Cir. 2011). And it will be the role of the new creditor Carrington, not Beneficial, to record any satisfaction or partial satisfaction of the lien. *See* Va. Code Ann. § 55–66.3 ("'Lien creditor' and 'creditor' . . . mean the holder, payee or obligee of a note, bond or other evidence of debt and shall embrace the lien creditor or his successor in interest as evidenced by proper endorsement or assignment, general or restrictive, upon the note, bond or other evidence of debt."); *Waynesboro Nat. Bank v. Smith*, 151 Va. 481, 491 (1928) ("The mortgage remains a lien until the debt it was given to secure is satisfied, and is not affected by a change of the note . . . ."). In short, any ongoing dispute that the heirs have is now with Carrington, not Beneficial.

"[A] party seeking a declaratory judgment has the burden of establishing the existence of an actual case or controversy." *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 95 (1993). The heirs have not carried this burden, and so these claims (Counts Five and Six) are dismissed without prejudice. *See Preiser v. Newkirk*, 422 U.S. 395, 402 (1975) (refusing to grant declaratory relief because the controversy was moot); *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1119 (4th Cir. 2014) (refusing to grant declaratory relief because there was no "controversy of sufficient immediacy and reality").

### III. MOTION TO AMEND

Perhaps realizing that these claims are now moot, the heirs moved to file a third amended complaint that would add Carrington as a party and add new damages theories against Beneficial and Ditech. (Dkt. 65). When Judge Conrad granted the heirs' request to file a second amended complaint, he advised them "that no further amendments will be permitted absent extraordinary circumstances." (Dkt. 33). Beneficial's sale of the mortgage at issue was outside of the heirs' control, but with all of the other claims dismissed, the motion to amend will still be denied.

Requests to add new parties through amendment are generally governed by Federal Rules of Civil Procedure 15 and 20. *Galustian v. Peter*, 591 F.3d 724, 730 (4th Cir. 2010). Under these rules, the heirs are required to seek "the opposing party's written consent or the court's leave" to amend at this stage, Fed. R. Civ. P. 15(a)(2), but amendments "should be freely allowed" by courts. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 469 (4th Cir. 2007). However, courts may deny motions to amend "when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 409 (4th Cir. 2013) (citation omitted). Where, as here, there has been a scheduling order, amendment becomes more difficult and the moving party must show "good cause." *See* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."); *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008) ("[A]fter the deadlines provided by a scheduling order have passed, the good cause standard must be satisfied to justify leave to amend the pleadings.").

I deny the heirs' motion to amend because amendment would prejudice Ditech and Beneficial. Addition of new damages theories, after the close of discovery and summary judgment briefing, would prejudice the defendants by unnecessarily extending the length and scope of the litigation. *See Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 604 (4th Cir. 2010) ("We find compelling the court's analysis that the amendment—coming so belatedly— would change the nature of the litigation and, would therefore, prejudice Niles Bolton."). Additionally, as I have demonstrated above, the claims against Ditech and Beneficial either fail on their merits or are moot. Allowing the addition of Carrington would not change this. *See Aleman v. Chugach Support Servs., Inc.*, 485 F.3d 206, 218 n.3 (4th Cir. 2007) ("[J]oining new

17

claims against a new party with now dismissed claims would not promote the [objectives of Rules 15 and 20] and the district court did not err in denying leave to amend."). The heirs' claims are against Carrington, and it would prejudice these parties to be pulled along to watch that dispute unfold. Accordingly, the motion to amend is denied.

### IV. Conclusion

I must grant the defendants' motions for summary judgment. The heirs have not been able to demonstrate that there is a genuine dispute of material fact that the second loan was in fact discharged. Accordingly, its claims related to that loan fail. And now that Beneficial has sold the second loan, this Court cannot grant the relief the heirs seek. The heirs dispute is now with Carrington alone, and so the case is dismissed.

An appropriate Order will issue, and the Clerk of the Court is hereby directed to send a copy of this Memorandum Opinion to Plaintiffs, Defendants, and all counsel of record.

Entered this  16th   day of February 2018.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE